AO 108 (Rev. 06/09) Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Illinois

| | | |
|---|---|---|
| In the Matter of the Seizure of | ) | |
| *(Briefly describe the property to be seized)* | ) | |
| Funds contained in the account ending in 6313 at | ) | Case No. 14 CR 50005 |
| Alpine Bank and in the account ending in 5645 at | ) | |
| U.S. Bank | ) | |

**FILED**

MAY 2 0 2014

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____Northern_____ District of _____Illinois, Western Division___ is subject to forfeiture to the United States of America under _____18_____ U.S.C. § _____982(a)(7)_____ *(describe the property)*:

Funds contained in the bank account ending with numbers 6313 in the name of Housecall Physicians Group of Rockford located at Alpine Bank and funds contained in the bank account ending with numbers 5645 in the name of Housecall Physicians Group of Rockford, S.C., located at U.S. Bank.

The application is based on these facts:

On May 20, 2014, a superseding indictment was returned which alleges that the property to be seized is subject to forfeiture in the event of conviction. The grand jury returning the superseding indictment found probable cause for forfeiture of the property. The affidavit attached hereto and incorporated herein sets forth the reasons why an order under 21 U.S.C. § 853(e) may be inadequate.

☑ Continued on the attached sheet.

_____
*Applicant's signature*

Steven Blaum, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____05/20/2014_____

_____
*Judge's signature*

City and state: Rockford, Illinois

Iain D. Johnston, United States Magistrate Judge
*Printed name and title*



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

### AFFIDAVIT

I, STEVEN G. BLAUM, being duly sworn, state as follows:

### Introduction

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI),
United States Department of Justice, and have worked in this capacity since
August 2009.  My duties and responsibilities involve the investigation of violations
of federal statutes including major fraud statutes (Title 18, U.S. Code), economic
crimes and related offenses.   My statements in this affidavit are based upon
information I have derived from my investigation as a case agent of this matter in
the Chicago Division of the FBI.

2.      As an FBI Agent, I have participated in numerous health care fraud
investigations involving fraudulent billing of federal government programs.  I am
familiar with the methods in which health care fraud criminals and their associates
conduct health care fraud, including but not limited to, billing for services not
rendered, kick-backs, up-coding, money laundering, and conspiracy.

3.      I am one of the case agents assigned to the investigation of Dr.
CHARLES DEHAAN.  The investigation of DEHAAN has been conducted jointly by
DHHS/OIG and the Federal Bureau of Investigation.  I have knowledge of the facts
set forth in this affidavit as a result of my participation in the investigation.  More

specifically, I have reviewed reports prepared by other agents and investigators, including an investigator for the Illinois Department of Financial and Professional Regulation, and reviewed other evidence obtained during the investigation, including Medicare billing records. I also have discussed the facts of this investigation, as summarized herein, with other agents and investigators who had information relevant to the investigation.

4. On May 20, 2014, a superseding indictment was returned charging DEHAAN with twenty-three counts of health care fraud, in violation of Title 18, United States Code, Section 1347. The superseding indictment also contains a forfeiture allegation.

5. As described in more detail below, there is probable cause to believe that DEHAAN has knowingly and willfully defrauded the Medicare program by submitting false claims for reimbursement of home visiting physician services allegedly provided to elderly people, which services were never provided and were not medically necessary, and fraudulently obtained money from the Medicare program.

6. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of a seizure warrant, this affidavit does not contain all of the facts known by me with regard to the investigation and the individuals and events described herein. All witness interviews and conversations referenced in this affidavit are described in summary, non-verbatim form; such

2

summaries do not constitute, and do not purport to be, detailed recitations of all statements made by all of the participants in the interviews and/or conversations. Finally, all dates and dollar amounts referenced herein are approximate.

## Property to be Seized

7.     This affidavit is submitted in support of an application for a seizure warrant authorizing the seizure of approximately $300,989.00 in United States currency contained in the account number ending in 6313 in the name of Housecall Physicians Group of Rockford located at Alpine Bank ("**Subject Account 1**") and the account number ending in 5645 in the name of Housecall Physicians Group of Rockford, S.C. located at U.S. Bank ("**Subject Account 2**").  For the reasons stated below, there is probable cause to believe that these funds constitute or are derived, directly or indirectly, from gross proceeds traceable to the commission of health care fraud offenses, in violation of Title 18, United States Code, Section 1347, and that the funds may be seized pursuant to Title 21, United States Code, Section 853(f) and forfeited pursuant to Title 18, United States Code, Section 982(a)(7).

## The Medicare Program

8.     Medicare is a federally-funded national health care benefit program that provides free or below-cost health care benefits to certain eligible individuals, primarily individuals who are least 65 years of age or who have certain disabilities. Medicare is comprised of several different "parts," most notably:  "Part A," which

3

covers a portion of the costs of hospital inpatient stays and home health care; and "Part B," which covers a portion of certain outpatient physician visits and services.

9. Medicare is administered by the Centers for Medicare and Medicaid Services, an agency of DHHS. CMS in turn contracts with other organizations, usually health insurance carriers, to process Medicare claims and to perform certain administrative functions. Two such contractors are Wisconsin Physicians Services ("WPS") and National Government Services ("NGS") that administer and pay Part B claims from the Medicare Trust Fund. The Medicare Trust Fund is a reserve of monies provided by the federal government. WPS and NGS process Medicare Part B claims submitted for physicians' services for beneficiaries in multiple states including Illinois, Indiana, and Michigan.

10. Enrolled providers of medical services to Medicare recipients are eligible for reimbursement for covered medical services. By becoming a participating provider in Medicare, enrolled providers agree to abide by the rules, regulations, policies, and procedures governing reimbursement, and to keep and allow access to records and information as required by Medicare.

11. Providers of health care services to Medicare beneficiaries seeking reimbursement under the program must submit a claim form, called a "CMS 1500," with certain information regarding the Medicare beneficiary, including the beneficiary's name, health insurance claim number, date the service was rendered, location where the service was rendered, type of services provided, number of

4

services rendered, the procedure code (described further below), a diagnosis code (known as an "ICD-9 code"), charges for each service provided, the provider's unique identifier (known as a Provider Transaction Access Number), and a certification that such services were personally rendered by that provider.

12.  In order to become a Medicare provider, a provider must file a Form CMS 855 which, among other things, identifies the provider's practice location, billing agency, medical record storage facilities, and an authorized contact person. The medical record storage facility identified by the provider is where the provider stores medical records of patients billed for Medicare services. Typically, the records must be kept for five years after the date of billing. An identified location is necessary for CMS auditors to perform required audits of the patient files.

13.  The American Medical Association has established certain codes to identify medical services and procedures performed by physicians, which are collectively known as the Physicians' Current Procedural Terminology ("CPT") system. The CPT system provides a national correct coding practice for reporting services performed by physicians and for payment of Medicare claims. CPT codes are widely used and accepted by health care providers and insurers, including Medicare and other health care benefit programs.

14.  The American Medical Association has established CPT codes for home visits with new and established patients. Since 1998, home visits with new patients are billed using CPT codes 99341 through 99345, and home visits with established

5

patients are billed using CPT codes 99347 through 99350. Higher CPT codes within the 99341-99345 range and the 99347-99350 range indicate visits of a more complicated nature.

15.     Specifically, according to the American Medical Association's annual Current Procedural Terminology manuals, since 1998, a home visit with an established patient is billed based on three key components: (1) the extent of the patient history that the physician takes during the visit, (2) the extent of the examination performed by the physician during the visit, and (3) the medical decision making done by the physician, which refers to the "complexity of establishing a diagnosis and/or selecting a management option."

16.     According to the CPT manuals, medical decision making is measured by: (1) "the number of possible diagnoses and/or the number of management options that must be considered," (2) "the amount and/or complexity of medical records, diagnostic tests, and/or other information that must be obtained, reviewed, and analyzed," and (3) "the risk of significant complications, morbidity, and/or mortality, as well as comorbidities, associated with the patient's presenting problems(s) (sic), the diagnostic procedure(s), and/or the possible management options." The table below is from the Centers for Medicare and Medicaid Services' Evaluation and Management Services Guide, and summarizes what is involved with each kind of medical decision making.

6

| TYPE OF DECISION MAKING | NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS | AMOUNT AND/ OR COMPLEXITY OF DATA TO BE REVIEWED | RISK OF SIGNIFICANT COMPLICATIONS, MORBIDITY, AND/OR MORTALITY |
|---|---|---|---|
| Straightforward | Minimal | Minimal or None | Minimal |
| Low Complexity | Limited | Limited | Low |
| Moderate Complexity | Multiple | Moderate | Moderate |
| High Complexity | Extensive | Extensive | High |

17.    According to the American Medical Association's annual Current Procedural Terminology manuals, since 1998, for a home visit with an established patient to be billed properly under CPT code 99347, it must have at least two of the following key components:

- A problem focused interval history, which covers the "chief complaint; brief history of present illness or problem"

- A problem focused examination, which is a "limited examination of the affected body or organ system"

- Straightforward medical decision making

18.    According to the CPT manuals, a home visit that qualifies for CPT code 99347 "usually" involves a problem or problems that are "self limited or minor," which is defined as a "problem that runs a definite and prescribed course, is transient in nature, is not likely to permanently alter health status OR has a good prognosis with management/compliance." According to the manuals, "Physicians typically spend 15 minutes face-to-face with the patient and/or family."

7

19.     According to the CPT manuals, since 1998, for a home visit with an established patient to be billed properly under CPT code 99348, it must have at least two of the following key components:

- An expanded problem focused interval history, which covers the "chief complaint; brief history of present illness; problem pertinent system review"

- An expanded problem focused examination, which is a "limited examination of the affected body area or organ system and other symptomatic or related organ system(s)"

- Medical decision making of low complexity

20.     According to the CPT manuals, a home visit that qualifies for CPT code 99348 "usually" involves a problem or problems that are "of low to moderate severity." According to the CPT manuals, a problem of "low severity" is one "where the risk of morbidity without treatment is low; there is little to no risk of mortality without treatment; full recovery without functional impairment is expected." According to the CPT manuals, a problem of "moderate" severity is one "where the risk of morbidity without treatment is moderate; there is a moderate risk of mortality without treatment; uncertain prognosis OR increased probability of prolonged functional impairment." According to the manuals, "Physicians typically spend 25 minutes face-to-face with the patient and/or family."

21.     According to the CPT manuals, since 1998, for a home visit with an established patient to be billed properly under CPT 99349, it must have at least two of the following key components:

8

- A detailed interval history, which covers the "chief complaint; extended history of present illness; problem pertinent system review extended to include a review of a limited number of additional systems; pertinent past, family, and/or social history directly related to the patient's problems"

- A detailed examination, which is an "extended examination of the affected body area(s) and other symptomatic or related organ systems(s)"

- Medical decision making of moderate complexity

22.     According to the CPT manuals, a home visit that qualifies for CPT code 99349 "usually" involves a problem or problems of "moderate to high severity." According to the CPT manuals, a problem of "high" severity is one where "the risk of morbidity without treatment is high to extreme; there is a moderate to high risk of morbidity without treatment OR high probability of severe, prolonged functional impairment." According to the manuals, "Physicians typically spend 40 minutes face-to-face with the patient and/or family."

23.     According to the CPT manuals, since 1998, for a home visit with an established patient to be billed properly under CPT code 99350, it must have two of the following key components:

- A comprehensive interval history, which covers the "chief complaint; extended history of present illness; review of systems that is directly related to the problem(s) identified in the history of the present illness plus a review of all additional body systems; **complete** past, family and social history" (bold in original)

- A comprehensive examination, which is defined as a "general multisystem examination or a complete examination of a single organ system"

9

      -   Medical decision making of moderate to high complexity

24.    According to the AMA's CPT manual, a home visit that qualifies for CPT code 99350 "usually" involves a problem or problems of "moderate to high severity." According to the manuals, "The patient may be unstable or may have developed a significant new problem requiring immediate physician attention. Physicians typically spend 60 minutes face-to-face with the patient and/or family."

25.    The Centers for Medicare and Medicaid Services' Evaluation and Management Services Guide, which includes documentation guidelines from 1995 and 1997, provides further guidance on what is involved for each of the types of histories referenced in the CPT manuals. The following table is taken from the Evaluation and Management Services Guide and summarizes what is involved for each type of history:

| TYPE OF HISTORY | CHIEF COMPLAINT | HISTORY OF PRESENT ILLNESS | REVIEW OF SYSTEMS | PAST, FAMILY, AND/OR SOCIAL HISTORY |
|---|---|---|---|---|
| Problem Focused | Required | Brief | N/A | N/A |
| Expanded Problem Focused | Required | Brief | Problem Pertinent | N/A |
| Detailed | Required | Extended | Extended | Pertinent |
| Comprehensive | Required | Extended | Complete | Complete |

26.    According to the Centers for Medicare and Medicaid Services' Medicare Claims Processing Manual, Chapter 12, "[m]edical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a

CPT code. It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted."

27.     In addition, the Medicare Claims Processing Manual states as follows regarding a comprehensive history, which is one of the key components for billing a home visit with an established-patient using CPT code 99350:

> The comprehensive history must include a review of all the systems and a complete past (medical and surgical) family and social history obtained at that visit. In the case of an established patient, it is acceptable for a physician to review the existing record and update it to reflect only changes in the patient's medical, family, and social history from the last encounter, but the physician must review the entire history for it to be considered a comprehensive history.

28.     Medicare payments on claims under CPT codes 99347 and 99348 generally are less than the payments on claims under CPT codes 99349 and 99350. The table below summarizes the requirements and typical characteristics of established-patient visits that are correctly billed using CPT codes 99347 through 99350, along with the approximate fees paid for such visits in the Chicago area in both 2009 and 2013.

| CPT code | Interval history or examination | Medical decision making | Typical problem | Typical amount of time | Approximate fees for Chicago (2009 / 13) |
|---|---|---|---|---|---|
| 99347 | Problem focused | Straightforward | Self limited or minor | 15 minutes | $56.13 / $58.94 |
| 99348 | Expanded problem focused | Low | Low to moderate severity | 25 minutes | $84.46 / $88.91 |

11

| CPT code | Interval history or examination | Medical decision making | Typical problem | Typical amount of time | Approximate fees for Chicago (2009 / 13) |
|---|---|---|---|---|---|
| 99349 | Detailed | Moderate complexity | Moderate to high severity | 40 minutes | $122.82 / $134.45 |
| 99350 | Comprehensive | Moderate to high complexity | Unstable patient or significant new problem requiring immediate physician | 60 minutes | $171.25 / $187.70 |

### Evidence Supporting Probable Cause

29.    Records of the Illinois Secretary of State indicate that Housecall Physicians Group of Rockford, S.C., is presided over by CHARLES S. DEHAAN, MD at 124 North Water Street, Rockford, Illinois 61107.  Housecall Physicians Group of Rockford, S.C. is listed as having the previous business names of "MD@HOME," "House Calls of Greater Chicago, S.C.," and "MD At Home, S.C."

30.    In 2004, DEHAAN was approved for enrollment in the Medicare program.  DEHAAN is listed, according to Medicare enrollment data, as having ownership in Housecall Physicians Group of Rockford, S.C.

**Beneficiary S.L.**

31.    Law enforcement agents interviewed Medicare beneficiary S.L.  S.L. stated that she was a resident of an assisted living center in Rockford, Illinois as of October 2010. According to S.L., while living at this center, S.L. was in need of a

12

motorized scooter due to an injury to her hip. S.L. stated that DEHAAN was sent to S.L.'s room to perform the evaluation and measurements for the motorized wheelchair. S.L. stated that while measuring S.L. for the wheelchair, DEHAAN began rubbing and caressing S.L.'s breasts. S.L. told DEHAAN to stop what he was doing, at which time he did. DEHAAN then finished his measurements and concluded the visit.

32. S.L. stated that DEHAAN returned to her unit at the assisted living center a few weeks later. DEHAAN entered S.L.'s unit and quickly exposed his penis to S.L. through his hospital scrubs. S.L. asked DEHAAN what he was doing, to which he responded with words to the effect of "you turn me on." S.L. ordered DEHAAN to immediately leave her home. DEHAAN left her home without performing any medical evaluation or services of any kind.

33. According to S.L., on or about December 8, 2010, S.L. moved to another assisted living facility in Rockford, Illinois. Shortly after moving in, DEHAAN again appeared at S.L.'s front door. He told S.L. that he was the medical director at the facility and as such, had a right to come into her unit. S.L. stated that she did not want to allow DEHAAN into her room, but felt that she had no choice. DEHAAN initially went into S.L.'s bathroom and exited with his penis outside of his pants. DEHAAN told S.L. that if S.L. would provide him sexual gratification, he would give S.L. a prescription for any medication that S.L. wanted. S.L. refused and ordered DEHAAN to leave her unit.

13

34.     According to S.L., on or about January of 2013, S.L. moved into another facility in in Rockford, Illinois.  Soon after moving in, DEHAAN again came to S.L.'s door and demanded to be allowed access.  DEHAAN told S.L. that he was the medical director at that facility as well and had access to her unit.  DEHAAN entered her unit briefly before S.L. ordered him to leave.

35.     S.L. stated that DEHAAN never provided any medical services to her other than the initial measurements taken for the motorized scooter.  At no time during any of the other instances in which DEHAAN was in S.L.'s presence did S.L. allow DEHAAN to touch S.L., and he never performed any medical evaluations of her, nor provided her with any medical service.[1]

36.     According to Medicare billing data, DEHAAN billed, and was paid by Medicare, for the following services for S.L:

| Date of Service | Procedure Code | Amount Actually Paid to DEHAAN |
|---|---|---|
| 10/06/2010 | 99345 | $166.30 |
| 10/20/2010 | 99350 | $134.67 |
| 12/01/2010 | 99349 | $96.18 |
| 01/17/2011 | 99349 | $0.00 |
| 02/28/2011 | 99349 | $96.57 |
| 05/20/2013 | 99345 | $165.64 |

[1] According to Rockford Police reports, in 2011, S.L made a police report complaining about DEHAAN and at that time, the allegations were consistent with the information above.

14

**Interview of L.S.**

37.    Law enforcement agents interviewed Medicare beneficiary L.S.  L.S. stated that DEHAAN became L.S.'s physician around Spring of 2009, when L.S's regular physician was no longer available.  L.S. was familiar with DEHAAN as the physician for L.S.'s spouse, who died in or around 2007.

38.    L.S. stated that during his first visit to her home, DEHAAN began "messing around with me," which L.S. described as fondling L.S.'s breasts.  L.S. stated that during this first visit, DEHAAN told L.S. words to the effect that L.S. "needed a man in her life," and "needed a man to take care of her."  During that first visit, DEHAAN exposed his penis to L.S. and told L.S. to "shake it off."  L.S. stated that DEHAAN placed his penis in L.S.'s hand and had her "playing with him," and then he took his penis in his own hand and he was "playing with himself."

39.    L.S. stated that since this incident in 2009, DEHAAN routinely had L.S. perform sexual gratification on him in a similar manner with her hands. According to L.S., this occurred about once every two months, which is how often DEHAAN visited L.S. at home.  L.S. stated that from 2009 until approximately December 2013, DEHAAN met her only for sexual contact and performed no medical services for L.S.

40.    L.S. stated that DEHAAN told her that he would write her prescriptions for any medications that L.S. wanted.  L.S. stated that L.S. only asked that he continue to fill prescriptions for medications that L.S. had been taking for

most of her life. L.S. stated that she was frightened to report DEHAAN's behavior for fear he would discontinue L.S.'s Medicare coverage and L.S.'s medications.

41. According to Medicare billing data, DEHAAN billed, and was paid by Medicare, for the following services billed under CPT codes 99349 and 99350 since March 2013:

| Date of Service | Procedure Code | Amount Paid to DEHAAN |
|---|---|---|
| 03/27/2013 | 99350 | $136.86 |
| 04/10/2013 | 99349 | $96.24 |
| 04/24/2013 | 99349 | $96.24 |
| 05/08/2013 | 99349 | $96.24 |
| 05/29/2013 | 99349 | $96.24 |
| 07/17/2013 | 99350 | $134.12 |
| 08/14/2013 | 99350 | $134.12 |
| 09/16/2013 | 99350 | $134.12 |
| 10/02/2013 | 99350 | $134.12 |
| 12/11/2013 | 99350 | $134.12 |

42. L.S. stated that she had reviewed Explanations of Benefits forms sent to her from Medicare, and saw that DEHAAN was paid by Medicare for removal of earwax that she knows was never performed. L.S. produced this EOB for

16

interviewing agents, which showed a procedure supposedly performed on March 27, 2013, CPT Code 69210, which is removal of earwax, for which DEHAAN was paid $40.92. Medicare records showed that DEHAAN also billed for CPT Code 69210 on July 17, 2013, and was paid $40.10. L.S. stated that this service was never provided to her.

**Interview of S.P.**

43.     Law enforcement agents interviewed Medicare beneficiary S.P. S.P. stated that in May 2011 DEHAAN came to S.P.'s room at a supportive living facility in Rockford, Illinois in order to evaluate S.P.'s ankle pain. S.P. stated that DEHAAN began to rub S.P.'s leg and then moved his hand towards S.P.'s genital area. S.P. then pushed DEHAAN's hand away and told DEHAAN to stop.

44.     S.P. stated that DEHAAN again moved his hand toward the genital area, and again S.P. told DEHAAN to stop. DEHAAN then stood up and S.P. noticed that DEHAAN's penis was erect, visible beneath his medical scrubs. After standing up with his erection displayed, DEHAAN left S.P.'s room.[2] S.P. stated she refused to see DEHAAN after this May 2011 incident.

45.     According to Medicare data, DEHAAN continued to bill for services purportedly rendered to S.P. after May 2011, including billing Medicare on

---

[2] According to Rockford Police reports, in 2011, S.P made a police report complaining about DEHAAN and at that time, the allegations were consistent with the information above.

November 20, 2013 for CPT code 99349 for the visit with S.P and was paid $96.24 for services purportedly rendered to S.P.

**Petition for Temporary Suspension**

46.    On or about January 14, 2014, the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation, filed a Petition for Temporary Suspension against DEHAAN.  According to this Petition, DEHAAN had inappropriate sexual contact with additional patients, including M.H.

47.    Law enforcement interviewed M.H., and M.H. stated that M.H. had sex with DEHAAN numerous times in approximately 2010 because DEHAAN agreed to prescribe her controlled substances, including Ritalin and Norco.  In exchange for the prescribed medications, M.H. had sex with DEHAAN approximately two to three times a month for approximately six months.  M.H. stated that on one occasion, DEHAAN performed a breast exam on M.H, but he did not perform any other medical services.

48.    According to Medicare billing data, DEHAAN billed, and was paid by Medicare, for the following services for M.H.:

| Date of Service | Procedure Code | Amount Paid to DEHAAN |
|---|---|---|
| 01/15/2013 | G0179 | $31.65 |
| 2/12/2013 | 99349 | $98.20 |
| 2/25/2013 | G0180 | $0 |

| 2/27/2013 | G0181 | $82.39 |
| 2/28/2013 | 69210 | $40.92 |
| 2/28/2013 | 94060 | $47.66 |
| 2/28/2013 | 99350 | $136.86 |
| 3/8/2013 | 99349 | $98.20 |

**Subject Accounts 1 and 2**

49.    According to Medicare records, prior to April 25, 2006, DEHAAN, or a representative for DEHAAN, instructed Medicare that for claims that were submitted for providers working under the Housecall Physicians Group of Rockford tax identification number 364069607, Medicare was to deposit funds directly into **Subject Account 1**. Medicare records indicate that the transfer of Medicare funds from Medicare into **Subject Account 1** was made effective by Medicare on or about April 25, 2006.

50.    In or around March 2014, agents obtained records for **Subject Account 1** for the time period of January 30, 2009, through January 31, 2014. A signature card was not provided to agents. Examination of the records provided by Alpine show that monthly statements for **Subject Account 1** were in the names of the following entities since January 30, 2009: Housecalls of Greater Chicago, S.C., 7479 Water Street, Suite 4, Rockford, Illinois, 61108 (01/30/2009 – 03/31/2011); MD At Home, 7479 Water Street, Suite 4, Rockford, Illinois, 61108 (04/01/2011 –

19

12/31/2012); MD At Home, 7431 East State Street, #226, Rockford, Illinois, 61108 (01/01/2012 – 03/31/2013); Housecall Physicians Group of Rockford, 124 North Water Street, Suite 208, Rockford, Illinois, 61107 (04/01/2013 – 01/31/2014).

51.    As discussed above, over the past year claims were submitted under DEHAAN's National Provider Identifier to Medicare for services he purportedly provided to Medicare beneficiaries. According to information reviewed by agents, Medicare (through its contracting agency NGS) deposited payments for these claims into **Subject Account** 1 as recently as on or about November 4, 2013.

52.    Review and analysis of the records obtained from Medicare and for **Subject Account** 1 show that between on or about May 20, 2013, and on or about November 4, 2014, Medicare (through its contracting agency NGS) directly deposited approximately $202,862.34 into **Subject Account 1**. During that time period, as discussed previously, fraudulent claims were submitted to Medicare under DEHAAN's individual billing number using CPT Codes 99349, 99350, 11042, 69210, and G0180. Given that there is probable cause to believe that DEHAAN did not conduct in-home medical evaluations (including detailed patient history and evaluation and/or medical decision making of moderate to high complexity) lasting 40 to 60 minutes; debridements of wounds; or removals of earwax, there is probable cause that DEHAAN fraudulently obtained from Medicare approximately

20

$202,862.34 in funds that DeHaan fraudulently directed Medicare to deposit into **Subject Account 1**.[3]

53.     According to Medicare records, on or about July 25, 2013, DEHAAN signed and submitted to Medicare a CMS-588 Electronic Funds Transfer (EFT) Authorization Agreement on which DEHAAN instructed Medicare that for claims that were submitted for providers working under the Housecall Physicians Group of Rockford S.C., tax identification number 364069607,[4] Medicare was to deposit funds directly into **Subject Account 2**.  Medicare records indicate that the transfer of Medicare funds from Medicare into **Subject Account 2** was made effective by Medicare on or about November 11, 2013.

54.     In or around March 2014, agents obtained records for **Subject Account 2** for the time period of November 11, 2013, through January 31, 2014.  A signature card was not provided to agents.  Examination of the records provided by US Bank show that all monthly statements for **Subject Account 2** were in the name of Housecall Physicians Group of Rockford, S.C.

55.     As discussed above, over the past year, claims were submitted under DEHAAN's National Provider Identifier to Medicare for services he purportedly

---

[3] The fraud perpetrated by DEHAAN may have resulted in Medicare fraudulently paying DEHAAN more than $202,862.34 between on or about May 20, 2013, and on or about November 4, 2013.   The amount attributed to DEHAAN's fraud stated in this affidavit is not meant to be binding on the government in connection with a final determination about DEHAAN's fraud or the loss caused by it.

[4] This tax identification number linked to **Subject Account 2** is the same as the tax identification number for **Subject Account 1**.

provided to Medicare beneficiaries. According to information reviewed by agents, Medicare (through its contracting agency NGS) deposited payments for these claims into **Subject Account 2** as recently as on or about January 30, 2014.

56.     Review and analysis of the records obtained from Medicare and for **Subject Account 2** show that between on or about November 11, 2013, and on or about January 30, 2014, Medicare (through its contracting agency NGS) directly deposited approximately $98,126.66 into **Subject Account 2**. During that time period, as discussed previously, fraudulent claims were submitted to Medicare under DEHAAN's individual billing number using CPT Codes 99349, 99350, 11042, 69210, and G0180. Given that there is probable cause to believe that DEHAAN did not conduct in-home medical evaluations (including detailed patient history and evaluation and/or medical decision making of moderate to high complexity) lasting 40 to 60 minutes; debridements of wounds; or removals of earwax, there is probable cause that DEHHAN fraudulently obtained from Medicare approximately $98,126.66 in funds that DEHAAN fraudulently directed Medicare to deposit into **Subject Account 2**.[5]

57.     I know from records obtained during the course of the investigation that all paid Medicare claims billed by DEHAAN under Tax Identification Number

---

[5] The fraud perpetrated by DEHAAN may have resulted in Medicare fraudulently paying DEHAAN more than $98,126.66 between on or about November 11, 2013, and on or about January 30, 2014. The amount attributed to DEHAAN's fraud stated in this affidavit is not meant to be binding on the government in connection with a final determination about DEHAAN's fraud or the loss caused by it.

364069607 were electronically transferred to **Subject Account 1** or **Subject Account 2**, depending on the claim date and the effective date of the subject account.

### Applicable Forfeiture Principles

58.     Based on my training and experience, I know that Title 18, United States Code, Section 982(a)(7) provides for the forfeiture of "property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense."

59.     Based on my training and experience, I also know that property subject to forfeiture may be seized pursuant to a warrant based on probable cause. *See* 21 U.S.C. § 853(f); 18 U.S.C. § 982(b)(1). I also know that Title 21, United States Code, Section 853(f) requires that the court determine that a restraining order under Section 853(e) "may not be sufficient to assure the availability of the property for forfeiture." Based on my training and experience, I know that restraining orders served on banks sometimes fail to preserve the property for forfeiture because the bank representative receiving the restraining order fails to put the necessary safeguards in place to freeze the money in time to prevent the account holder from accessing the funds electronically, or fails to notify the proper personnel as to the existence of the order, or the bank exercises its own right of setoff to satisfy an outstanding debt owed to the bank by the account holder. In

contrast, where funds are concerned, a seizure warrant guarantees that the funds will be in the Government's custody once the warrant is served.

60.    Accordingly, to seize the accounts in **Subject Account 1** and **Subject Account 2**, the Government must show that there is probable cause to believe that a health care offense(s) occurred and that the funds in **Subject Account 1** and **Subject Account 2** are property that constitute or are derived, directly or indirectly, from the gross proceeds traceable to the commission of the offense.

## Conclusion

61.    Based on the forgoing, your affiant submits that there is probable cause to believe that DEHAAN has committed the offense of health care fraud, in violation of Title 18, United States Code, Section 1347. Based on the forgoing, your affiant further submits that **Subject Account 1** and **Subject Account 2** contain the gross proceeds traceable to the commission of the offense.

24

62.    Wherefore, it is hereby requested that Special Agents with HHS and the FBI be authorized to seize, pursuant to Title 21, United States Code, Section 853(f), approximately $300,989.00 in **Subject Account 1** and **Subject Account 2**, as property that constitutes or is derived from gross proceeds traceable to the commission of a violation of Title 18, United States Code, Section 1347.

STEVEN BLAUM
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this 20th day of May, 2014.

IAIN D. JOHNSTON
United States Magistrate Judge
Northern District of Illinois

25